UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:18-CV-130

DAVID T. JOHNSON                                                         PLAINTIFF,

CC METALS & ALLOYS, LLC                             DEFENDANT.

**MEMORANDUM OPINION**

This matter is before the Court on Defendant CC Metals & Alloys, LLC's Motion for Summary Judgment. [DN 14]. Plaintiff David Johnson responded [DN 15], and Defendant replied, [DN 16]. This matter is now ripe for adjudication. For the reasons stated herein: Defendant's Motion for Summary Judgment is GRANTED.

**BACKGROUND**

This case arises out of Plaintiff David Johnson's employment with Defendant CC Metals & Alloys, LLC ("CCMA"). [DN 1]. In July 2017, CCMA hired Johnson to work as a furnace operator in its plant in Calvert City, Kentucky. *Id.* According to Johnson, teasing and horseplay were common among the workers at the plant. [DN 14-1 at 91]. Between July and December 2017, Johnson claims coworkers made three comments about his car, clothing, and hobbies. *Id.* at 96–99. First, Johnson overheard a coworker in the lunchroom state: "only gay guys drive two-door BMW sports cars." *Id.* at 96. In the locker room, Johnson also overheard a colleague say his clothes were "tight-fitting clothes, not camouflage, [but] pretty boy clothes." *Id.* at 97. Finally, Johnson claims a coworker asked him, "Everyone else here hunts, so why don't you?" *Id.* at 98, 99. In his

1

deposition, Johnson testified that these comments did not upset him. *Id.* at 98, 99, 102. In fact, Johnson admitted that he also engaged in "horseplay" while at work. *Id.* at 91. On several occasions Johnson took photographs of his coworkers at the plant, edited the pictures to include sexually and racially explicit content, and then sent the edited photos to his coworkers. *Id.* at 71–75, 125–128. Johnson claims he was also a target of his coworkers' edited photos, but he found the photos funny. [DN 15 at 190].

In December 2017, the nature of Johnson's relationship with his coworkers changed. [*Id.*; DN 14-1 at 91]. Johnson was sitting on a work bench when he was approached by his coworker, Emmit Gentry, who wanted to sleep where Johnson was sitting. [DN 14-1 at 89–90]. When Johnson refused to move, Gentry became upset and poured glue on Johnson's work area. *Id.* at 88. Johnson retaliated by messing up Gentry's work area. *Id.* at 89. The men exchanged words and planned to fight after work, though no fight ever took place. *Id.* at 92–93. After this encounter, Johnson believes that his coworkers started treating him differently. *Id.* at 91. He claims coworkers erased his name from the union's overtime sign-up sheet and wrote "fag" and "queer" next to his name on the overtime sheet and schedule. *Id.* at 91, 93, 94. Johnson does not know which of his coworkers wrote the derogatory language next to his name, but he estimates that it occurred 15-20 times between December 2017 and May 2018. *Id.* at 95. Johnson testified that he believed the offensive language was written because people had assumed his sexual orientation. *Id.* at 94.

On April 29, 2018, Johnson overfilled a casting bed with liquid metal. [DN 14-2 at 147]. As a result, Jason Forsythe, the employee taking over for Johnson in the next shift, had to spend time correcting Johnson's mistake. *Id.* Forsythe reported the incident to his supervisor, and the next day Johnson received a write-up. *Id.* Later that day, Forsythe shouted at Johnson in a crowded

lunchroom: "You wouldn't fuck a guy, would you?" [DN 14-1 at 76]. Johnson immediately left the lunchroom. *Id.* at 87.

On May 1, Johnson reported the comment to CCMA's Human Resource Administrator Treasa Cook and provided a list of people who had been present in the lunchroom. *Id.* at 76. Cook testified that she called each person identified by Johnson to investigate the incident, though no one recalled hearing the comment. [DN 15-1 at 213, 217]. Moreover, Cook claims that she did not inform any of the potential witnesses that Johnson had requested an investigation into the incident. *Id.* at 213. However, on May 3, Johnson informed Cook that his coworker, Adam Dawson, had told him that people at the plant believed that Johnson had gone to Human Resources over the incident. [DN 14-3 at 160; DN 15-1 at 215]. Johnson told Cook that he was stressed about the situation, his coworkers had given him bad looks, and he planned to leave early that day. [DN 14-3 at 160]. Cook told Johnson that she would speak to Dawson, but when she called him, he did not answer or get back to her. [DN 15-1 at 217, 218]. Although Johnson suspected that his coworkers knew the source of the complaint, he testified that no one talked to him about the complaint, and that he experienced no problematic comments or incidents after making the complaint. [DN 14-1 at 118–21].

Over the next few days, Johnson worked his normal eight-hour shift. *Id.* at 105. Again, he testified that there were no incidents regarding the complaint and that his coworkers did not speak to him. *Id.* at 119, 120. However, May 7 through May 10, Johnson did not come to work. *Id.* at 106–07. On May 11, Johnson attempted to email his resignation to CCMA. *Id.* at 129. The email stated that Johnson was resigning from CCMA due to "discrimination of sexual orientation and hostile work environment." *Id.* at 129. Additionally, the email noted that Forsythe was still working on Johnson's shift after making "homophobic remarks" to him in "front of 20 other

3

employees." *Id.* Finally, the email stated that the company had "done nothing to support [Johnson] legally with the known facts of harassment [because] of [his] sexual orientation." *Id.* During his deposition, Johnson also testified that he resigned because he feared for his safety. *Id.* at 84–85.

CCMA did not receive Johnson's resignation email because he sent it to an address that did not belong to the company. [DN 14 at 47]. However, when an employee does not come to work for several days, CCMA considers their absence a resignation of their position. [DN 15-1 at 213]. Accordingly, Cook drafted a letter to Johnson accepting his resignation as of May 14. *Id.* At this point, Cook testified that she terminated the investigation into the lunchroom incident but could not give a specific reason for this decision. *Id.* at 215.

Prior to filing this lawsuit, Johnson filed a charge against CCMA with the Equal Employment Opportunity Commission ("EEOC"). [DN 1-2]. The EEOC dismissed the charge and authorized Johnson to bring the current lawsuit. *Id.*

## LEGAL STANDARD

Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court "may not make credibility determinations nor weigh the evidence when determining whether an issue of fact remains for trial." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001); *Ahlers v. Schebil*, 188 F.3d 365, 369 (6th Cir. 1999)). "The ultimate question is 'whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Back v. Nestlé USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012) (quoting *Anderson*, 477 U.S. at 251–52).

As the party moving for summary judgment, CCMA must shoulder the burden of showing the absence of a genuine dispute of material fact as to at least one essential element of Johnson's claims. Fed. R. Civ. P. 56(c); *see also Laster*, 746 F.3d at 726 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). Assuming CCMA satisfies its burden of production, Johnson "must—by deposition, answers to interrogatories, affidavits, and admissions on file—show specific facts that reveal a genuine issue for trial." *Laster*, 746 F.3d at 726 (citing *Celotex Corp.*, 477 U.S. at 324).

## DISCUSSION

Johnson alleges two claims against CCMA in his Complaint: sexual harassment or sex discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq*. and sex discrimination in violation of the Kentucky Civil Rights Act, Ky. Rev. Stat. § 344.010 *et seq*. ("KCRA"). "Because the [KCRA] was based upon, and is virtually identical to, Title VII of the Federal Civil Rights Act of 1964, courts in Kentucky have followed federal law in interpreting and applying its statute." *Brewer v. General Drivers, Warehouseman & Helpers Local Union 89*, 190 F.Supp.2d 966, 974 (W.D. Ky. 2002). Thus, Johnson's KCRA claim is analyzed under the same framework as his Title VII claim.

Title VII prohibits employers from discriminating "against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To make out a prima facie case of sexual harassment based on allegations of a hostile work environment under

Title VII, a plaintiff must show that (1) he is a member of a protected class; (2) he was subject to unwelcome harassment; (3) the harassment was based on his sex; (4) the harassment created a hostile work environment; and (5) the employer failed to take reasonable care to prevent and correct any harassing behavior. *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 347 (6th Cir. 2005). While CCMA asserts a variety of arguments in support of its Motion for Summary Judgment, the Court finds that Johnson failed to establish a prima facie case of sexual harassment on at least three separate grounds.

## I. Sex Stereotyping and Sexual Orientation Discrimination under Title VII

The Sixth Circuit has categorically held that Title VII's prohibition of discrimination on the basis of sex applies only to gender discrimination and does not include discrimination based on sexual orientation. *Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757, 762 (6th Cir. 2006); *see also Gilbert v. Country Music Ass'n, Inc.*, 432 F. App'x 516 (6th Cir. 2011). Thus, sexual orientation discrimination is not an actionable claim under Title VII. However, the Supreme Court has recognized that "making employment decisions based on sex stereotyping, i.e., the degree to which an individual conforms to traditional notions of what is appropriate for one's gender is actionable discrimination under Title VII." *Vickers*, 453 F.3d at 762 (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (2006)). In *Price Waterhouse v. Hopkins*, an accounting firm passed over a female for a partnership position in part because she was too "macho." *Price Waterhouse*, 490 U.S. at 235. In order to secure a partnership position, the company advised the employee that she should "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry." *Id.* The Supreme Court held the employer's actions constituted discrimination based on sex stereotyping. *Id.* at 250.

The Sixth Circuit addressed the distinction between sex stereotyping and sexual orientation discrimination in *Vickers v. Fairfield Medical Center*, 453 F.3d 757 (6th Cir. 2006). There, a hospital employee was frequently subjected to sexual-based slurs, harassment regarding his sexuality and masculinity, vulgar gestures, and physical harassment by his coworkers. *Id.* at 759. Vickers sued his employer for sex discrimination based on a sex stereotyping theory, arguing that "in the eyes of his co-workers, his sexual practices, whether real or perceived, did not conform to the traditionally masculine role. Rather, in his supposed sexual practices, he behaved more like a woman." *Id.* at 763. In analyzing Vickers' claim, the Sixth Circuit interpreted the *Price Waterhouse* framework as "focused principally on characteristics that were readily demonstrable in the workplace." *Id.* Since Vickers failed to show discrimination based on gender non-conforming "behavior observed at work or affecting his job performance," such as his "appearance or mannerisms on the job," Vickers' claim was "more properly viewed as harassment based on [his] perceived homosexuality, rather than based on gender non-conformity." *Id.* Therefore, the court rejected Vickers' claim and noted that "recognition of [the] claim would have the effect of *de facto* amending Title VII to encompass sexual orientation as a prohibited basis for discrimination." *Id.* at 764; *see also Gilbert*, 432 F. App'x at 520 ("Gilbert cannot bootstrap protection for sexual orientation into Title VII under the guise of a sex-stereotyping claim." (internal citations omitted)).

A recent Sixth Circuit decision called into question *Vickers*' "observable-at-work" rule. In *Equal Employment Opportunity Commission v. R.G. & G.R. Harris Funeral Homes, Inc*, the issue before the court was whether a transgender employee could bring a claim for sex discrimination for failure to conform to sex stereotypes. 884 F.3d 560, 566 (6th Cir. 2018), *cert. granted in part sub nom. R.G. & G.R. Harris Funeral Homes, Inc. v. E.E.O.C.*, 139 S. Ct. 1599, 203 L. Ed. 2d 754

7

(2019). The court rejected the defense's argument that under *Vickers*, the plaintiff's "sex-stereotyping claim survives only to the extent that it concerns her 'appearance or mannerisms on the job,' but not as it pertains to her underlying status as a transgender person." *Id.* at 579. In doing so, the court noted that *Vickers* did not control the case because it "concerned a different legal question." *Id.* However, the court also stated it was not bound by *Vickers* to the extent that it contravenes two prior Sixth Circuit cases, *Smith v. City of Salem*, 378 F.3d 566 (6th Cir. 2004) and *Barnes v. City of Cincinnati*, 401 F.3d 729 (6th Cir. 2005), in which the court held that "a reasonable jury could conclude that a transgender plaintiff was discriminated against on the basis of his sex when, among other factors, his 'ambiguous sexuality and his practice of dressing as a woman *outside of work* were well-known within the workplace.'" *R.G.*, 884 F.3d at 580 (quoting *Barnes*, 401 F.3d at 738). Thus, the court concluded that the *Vickers*' observable-at-work rule was not binding in this circuit. *Id.*

The *R.G.* decision has led to a variety of conflicting district courts opinions. In *Kilpatrick v. HCA Human Resources, LLC*, the court granted summary judgment based on the plaintiff's failure to allege his gender non-conformity was observable at work. *Kilpatrick v. HCA Human Res., LLC*, No. 3:17-CV-00670, 2019 WL 998315, at *4 (M.D. Tenn. Mar. 1, 2019). The court dismissed the *R.G.* decision by stating, "the Court unequivocally left the *Vickers* decision intact. *Vickers* remains controlling authority with respect to Title VII claims based on the basis of sexual orientation . . . ." *Id.*; *see also Underwood v. Dynamic Sec., Inc.*, No. 3:18-CV-017, 2018 WL 3029257, at *4 (E.D. Tenn. June 18, 2018) ("Thus, the *R.G.* court addressed a different legal issue than that presented by *Vickers*, explicitly acknowledged its distinction from *Vickers*, and did not— and could not—overrule *Vickers*."). However, other district courts have recognized *R.G.* as limiting *Vickers*' holding regarding the observable-at-work requirement, finding that plaintiffs

may state a claim for gender nonconformance expressed outside of work. *Gentzler v. Hamilton Cty.*, No. 1:15-CV-295, 2018 WL 4999416, at *2 (E.D. Tenn. Mar. 15, 2018); *Varner v. APG Media of Ohio, LLC*, No. 2:18-CV-706, 2019 WL 145542, at *5 (S.D. Ohio Jan. 9, 2019); *Lindsey v. Mgmt. & Training Corp.*, No. 4:17-CV-00146-JHM, 2018 WL 2943454, at *2 (W.D. Ky. June 12, 2018) ("Title VII's protection against sex discrimination allow for claims 'based on gender nonconformance that is expressed outside of work.'"). While a discussion of *R.G.* was necessary to address Johnson's arguments against the Motion for Summary Judgment, this Court need not weigh in on the validity of the observable-at-work rule as it has little impact on the current case.

Here, Johnson claims that he was subjected to sexual harassment under a sex stereotyping theory. In its Motion for Summary Judgment, CCMA argues that Johnson's claim is actually based on his sexual orientation, though his Complaint attempts to reframe the allegations as sex stereotyping. [DN 14 at 54]. In response, Johnson incorrectly asserts that *Vickers* was overruled by *R.G.* and thus, whether the alleged harassment was based on Johnson's "choices, mannerisms, or sexual orientation is irrelevant." [DN 15 at 197]. In fact, sexual orientation cannot form the basis of a Title VII claim in the Sixth Circuit. Therefore, in order to prevail on a sexual harassment claim, Johnson must allege facts showing that he did not conform to traditional gender stereotypes in an observable way, and that these characteristics were the basis for the alleged harassment. Regardless of whether his nonconforming appearance and mannerisms were observable in or outside of work, Johnson fails to meet this standard as the alleged harassment was primarily based on his perceived sexual orientation, not his failure to conform to traditional gender norms.

First, Johnson's resignation email to CCMA specifically stated that his resignation was due to discrimination based on his sexual orientation. [DN 14-1 at 129]. Moreover, Johnson discussed CCMA's failure to remove Forsythe from his shift after making "homophobic remarks" about

9

Johnson's "orientation." *Id.* Finally, Johnson claimed that CCMA did not legally support him despite knowledge of "harassment [because] of [his] sexual orientation." *Id.* This initial email clearly shows that Johnson perceived the harassment was a result of his sexual orientation, not his gender non-conforming appearance and mannerisms.

Additionally, coworkers made three comments to Johnson regarding hunting, his car, and his clothing. While these comments were arguably based on gender non-conforming behavior, Johnson testified that these comments did not upset him and did not form the basis of his Complaint against CCMA. [DN 14-1 at 96–101]. The two incidents which Johnson admitted led to his Complaint, namely coworkers writing "queer" and "fag" on the overtime sheet and Forsythe stating, "You wouldn't fuck a guy, would you?", were clearly based on Johnson's perceived sexual orientation. Johnson also testified that he believed these comments were made because coworkers found out about his sexuality, not because of his non-conforming appearance and mannerisms. *Id.* at 94. While the comments made to Johnson were offensive and inappropriate, Johnson fails to present sufficient evidence that sex stereotyping formed the basis of the alleged harassment. Thus, as a matter of law, Johnson's claims do not fit within the prohibitions of Title VII and CCMA is entitled to summary judgment on his claims.

**II. Same Sex Harassment**

Even if Johnson could establish a sex stereotyping claim under Title VII, he failed to present sufficient evidence to establish a hostile work environment based on same sex harassment. In *Oncale v. Sundowener Offshore Services, Inc.*, the Supreme Court recognized that Title VII's protections extend to hostile work environment claims based on same sex harassment. 523 U.S. 75, 78 (1998). "However, an individual does not make out a claim of sexual harassment 'merely

because the words used have sexual content or connotations.'" *Vickers*, 453 F.3d at 765 (quoting *Oncale*, 523 U.S. at 80). "The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Oncale*, 523 U.S. at 80. Thus, there are three ways a male plaintiff could establish a hostile work environment claim based on same sex harassment: "(1) where the harasser making sexual advances is acting out of sexual desire; (2) where the harasser is motivated by general hostility to the presence of men in the workplace; and (3) where the plaintiff offers 'direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace.'" *Vickers*, 453 F.3d at 765 (quoting *Oncale* at 80–81).

In this case, Johnson presented no evidence to establish a hostile work environment claim based on same sex harassment. First, Johnson failed to identify which of his coworkers made comments about his car, clothes, or lack of hunting, or which individuals wrote the sexual slurs on the overtime sheet. Thus, there is no evidence to suggest that the alleged harassers acted out of sexual desire. Similarly, there is no evidence to suggest Forsythe made his comment out of sexual desire for the Johnson. Second, Johnson offered no evidence that the alleged harassment was motivated by a general hostility to the presence of men in the workplace. Finally, there is also no direct comparative evidence regarding the difference in how the alleged harassers treated members of both sexes in the workplace. Accordingly, Johnson fails to establish a hostile work environment claim based on same sex harassment as a matter of law and CCMA is entitled to summary judgment on his claims.

**III. Hostile Work Environment**

Assuming that Johnson could establish a claim for same sex harassment under a sex stereotyping theory, his claim fails to establish that the harassment created a hostile work environment. A hostile work environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). To be sufficiently "severe or pervasive," (1) the conduct must be enough to create an environment that a reasonable person would find hostile or abusive, and (2) a plaintiff must subjectively regard the environment as abusive. *Id.* Courts look to the totality of the circumstances to determine whether an objectively hostile work environment exists, including such factors as the frequency of the discriminatory conduct; its severity; whether it is physically threatening, humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Slayton v. Ohio Dep't of Youth Servs.*, 206 F.3d 669, 678–79 (6th Cir. 2000) (citing *Morris v. Oldham Cnty. Fiscal Ct.*, 201 F.3d 784, 789–90 (6th Cir. 2000)). "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) do not amount to a hostile work environment." *Johnson v. Rumsfeld*, 238 F. App'x 105, 108 (6th Cir. 2007) (internal citations omitted).

"The determination of whether harassing conduct is sufficiently severe or pervasive to establish a hostile work environment is not susceptible to a 'mathematically precise test.'" *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 333 (6th Cir. 2008) (quoting *Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 251 (6th Cir. 1998)). However, sexual comments and harassing acts of a "continual," "ongoing," and "commonplace" nature are more likely to be deemed pervasive. *Id.* (quoting *Abeita*, 159 F.3d at 252). In *Abeita v. TransAmerica Mailing, Inc.*, the Sixth Circuit reversed a grant of summary judgment in favor of an employer on a hostile

environment claim in which the plaintiff was subjected to ongoing offensive comments over a seven-year period. *Abeita*, 159 F.3d at 252. Additionally, "harassment involving an 'element of physical invasion' is more severe than harassing comments alone." *Hawkins*, 517 F.3d at 334 (quoting *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 563 (6th Cir. 1999)). In *Williams v. General Motors Corp.*, the Sixth Circuit reversed a lower court's grant of summary judgment in favor of General Motors when the plaintiff alleged fifteen instances of sexual harassment over a one-year period. *Williams*, 187 F.3d at 559. While the allegations in the case included derogatory remarks and sexually explicit comments directed at the plaintiff, including looking at her breasts and stating, "You can rub up against me anytime," and "You would kill me, Marilyn. I don't know if I can handle it, but I'd die with a smile on my face," the Sixth Circuit placed special emphasis on the fact that three of the alleged incidents "were not merely crude, offensive, and humiliating, but also contained an element of physical invasion." *Id.* at 563 ("[H]e put his arm around her neck and placed his face against hers, and noticing that she had written "Hancock Furniture Company" on a piece of paper, said, "You left the dick out of the hand." Finally, one day while bending over, he came behind her and said, "Back up; just back up."). However, in *Burnett v. Tyco Corp.*, the Sixth Circuit affirmed a summary judgment in favor of an employer after finding that "a single battery coupled with two merely offensive remarks over a six-month period does not create an issue of material fact as to whether the conduct alleged was sufficiently severe to create a hostile work environment." *Burnett v. Tyco Corp.*, 203 F.3d 980, 985 (6th Cir. 2000) (Plaintiff's supervisor placed a pack of cigarettes inside the plaintiff's shirt and beneath her bra strap; stated that the plaintiff had "lost her cherry," and that he was aroused by the phrase "dick the malls.").

In this case, Johnson failed to meet the objectively severe or pervasive standard for a hostile work environment claim. Johnson contends that sexual harassment was severe and pervasive at

CCMA. In support of his argument, Johnson recalls two comments he overheard his coworkers make regarding his clothing and car, namely that "only gay guys drive two door BMWs" and "only gay guys wear tight-fitting clothes." [DN 14-1 at 96–97]. Johnson also claims that a coworker rhetorically asked him why he did not hunt like everyone else working at the plant. *Id.* at 98, 99. Beginning in December 2017, Johnson claims the words "fag" and "queer" were written next to his name on the overtime sheet 15-20 times, and sometimes his name was erased. *Id.* at 95. Finally, in April 2018, a coworker shouted, "You wouldn't fuck a guy, would you?" at Johnson in a crowded lunchroom.[1] *Id.* at 76.

Based on the totality of the circumstances, these instances do not amount to a severe or pervasive course of discriminatory conduct. First, the comments directed at Johnson were not ongoing or continuous as they occurred at isolated and sporadic instances over an eleven-month period. While the sexual slurs appeared on the overtime sheet at a greater frequency, their impact on the work environment is minimized by the fact that they were not coupled with any physical invasion. *See Williams*, 187 F.3d at 559, 563 (Fifteen allegations of harassment over a one-year period, but the court focused primarily on three incidents that "contained an element of physical invasion."). Moreover, when comparing these allegations to other sexual harassment cases, the comments and slurs directed at Johnson were more akin to simple teasing and offhand comments rather than "extremely serious" incidents. *See Johnson*, 238 F. App'x at 108. This is further

---

[1] Johnson also submits a declaration from Marsha Forrester, a security worker at CCMA [DN 15-5], which claims that she heard CCMA workers making constant jokes about Johnson's sexual orientation at the company's vending machines. *Id.* CCMA argues this testimony is inadmissible hearsay and should not be considered at this stage of the litigation. [DN 16 at 295]. However, pursuant to *Albeita*, evidence is only relevant at this stage of a plaintiff's hostile environment claim if plaintiff was aware of the evidence at the time they were subject to the hostile environment. *Albeita*, 159 F.3d at 249; *see also Burnett*, 203 F.3d at 981. Since Johnson failed to allege that he was aware of the jokes regarding his sexuality occurring at the vending machine, Forrester's testimony cannot be considered.

supported by the fact that "jokes, comments, or 'busting each other's chops'" were common at CCMA. [DN 15 at 185]. Indeed, Johnson testified that everyone at CCMA "horseplayed" and he "horseplayed" with his coworkers [DN 14-1 at 91], including by sending sexually and racially graphic photographs to coworkers. *Id.* at 71–75, 125–28. For these reasons, the Court finds that Johnson failed to show that the alleged harassment was objectively severe or pervasive, and thus, he cannot establish a hostile work environment claim as a matter of law. Accordingly, CCMA is entitled to summary judgment on Johnson's claims.

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment [DN 14] is **GRANTED.** The Court will enter a separate Order and Judgment consistent with this Memorandum Opinion.

*[Signature: Thomas B. Russell]*

**Thomas B. Russell, Senior Judge**
**United States District Court**

September 20, 2019

CC: Attorneys of Record